IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JULIE REBECCA ZOBEL,

      Plaintiff,

v.                                        CASE NO. 1:14-cv-45-MP-GRJ

CAROLYN COLVIN, Commissioner
of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits (DIB). Doc. 1.   The Commissioner has answered, and both parties have filed briefs outlining their respective positions. Docs. 7, 11, & 12.  For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB benefits protectively on March 13, 2007, alleging disability commencing on March 9, 2006.  R. 277-281, 299.  The claim was denied initially on May 22, 2007, and upon reconsideration on August 23, 2007.  R. 167-169, 173-174.  Plaintiff requested a hearing which was held on September 16, 2009, before ALJ Apolo Garcia.  R. 107-135, 175.   On December 4, 2009, the ALJ found Plaintiff not disabled and denied benefits.  R. 140-161.  The Appeals Council remanded the case for further proceedings.  R.  162-166.

A second hearing was held on February 23, 2012, before ALJ Teresa J. McGarry.  R. 37-106.  On May 18, 2012, the ALJ found Plaintiff not disabled.  R. 16-36. The Appeals Council denied review.  R. 1-6.   Accordingly, the ALJ's decision became the Commissioner's final decision. This appeal followed.  Plaintiff asserts two issues for review: (1) The ALJ failed to apply the correct legal standards to the opinions of her treating physicians; and (2) The ALJ failed to properly evaluate her allegations of pain and limitation.  Doc. 11.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner

---

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

### III.  <u>SUMMARY OF THE RECORD</u>

#### A.  <u>Findings of the ALJ</u>

In addition to the medical evidence of record, the ALJ relied upon the testimony of Dr. John W. Axline, a board certified orthopedist, in assessing the extent and severity of Plaintiff's medical impairments.  The ALJ found that the Plaintiff had the severe impairments of Crohn's disease; synovitis of the right wrist and right hand; and degenerative disc disease of the lumbar spine, but that none of her impairments met or equaled the Listings.   The ALJ determined that Plaintiff had the residual functional capacity to lift or carry up to 20 pounds occasionally and up to 10 pounds frequently. The ALJ also found that in an 8-hour workday, Plaintiff could sit for up to 6 hours, stand for up to 1 hour, and walk for up to 1 hour.  She could never push or pull with her right hand and could no more than frequently reach, handle, finger, or feel with her right hand.   The ALJ found that she could never climb ladders or scaffolds and could no more than occasionally balance, stoop, kneel, crouch, crawl, or climb stairs or ramps. The ALJ also found that Plaintiff required work that would allow her to take a five-minute bathroom break every hour.   Based on testimony from a vocational expert (VE), the ALJ found that Plaintiff could perform her past relevant work as an administrative assistant as the job is generally performed in the national economy.   Thus, the ALJ found Plaintiff not disabled.

## B. Plaintiff's Medical Records

Plaintiff began treating with Charles Sninsky, M.D., a digestive disease specialist, in 2000.  At an April 2005 follow-up appointment, Dr. Sninsky noted:   "1. Crohn's colitis initially believed to be ulcerative colitis.  2. Positive ANA[21] 1:1200, possibly related to Remicade.  3. Human antichimeric antibody (HACA 4.8 mcg).  4. Nonspecific pulmonary abnormal CT scan.  5. Possible rheumatoid arthritis.  6. Heartburn with partial control with Protonix[.]"  R. 381.

Plaintiff began treating with Donald Scott, M.D., in 2000.  At a January 2006 follow-up appointment for rheumatoid arthritis, Dr. Scott noted a positive ANA.  R. 419-20.  In November 2006, x-rays of Plaintiff's right wrist revealed diffuse osteopenia in addition to articular cartilage loss and joint space narrowing in the radiocarpal joint associated with mild subchondral sclerosis.  R. 428.

In April 2007, Dr. Sninsky noted that Plaintiff's Crohn's symptoms were being partially controlled with Methotrexate.  He noted that Plaintiff experienced a slight worsening of her chronic migraine headaches.  R. 430-34.

In October 2007, Dr. Sninsky noted that Plaintiff was taken off of Methotrexate due to elevation in LFTs.   He also noted a history of intolerance to Remicade and Enbrel. *Id.*  Plaintiff reported having four to five bowel movements daily with exacerbations about once a month, during which she experienced increased abdominal

---

[21]ANA refers to "antinuclear antibodies."

pain and up to twenty stools daily. *Id.* Her current symptoms included frequent

constipation, pain with bowel movement, mucus in her stool, frequent diarrhea, black or

sticky stools and frequent stomach pain.   R. 464-66.

In May 2008, Plaintiff had an MRI scan of her lumbar spine which revealed

degenerative disc disease at L4-5-S1 levels.  R. 478, 500.

In January 2009, Dr. Scott completed an Arthritis Questionnaire, noting that he

had been treating Plaintiff since 2000 every one to three months.  R. 515.  He noted that

Plaintiff's diagnoses included rheumatoid arthritis, Crohn's, fibromyalgia, and low back

pain/lumbar radiculopathy. *Id.*  Her prognosis was "good".  Dr. Scott noted that Plaintiff's

symptoms included fatigue, joint pain/swelling, headaches/migraines, abdominal pain,

diarrhea and hematochezia. *Id.*  He noted that the pain from rheumatoid arthritis varied.

*Id.* Dr. Scott noted Plaintiff had a reduced range of motion of certain joints and she had

positive trigger points. *Id.*  He opined that Plaintiff "often" experienced pain severe

enough to interfere with attention and concentration, and that Plaintiff's impairments

were *"reasonably consistent"* with the symptoms and functional limitations described in

his evaluation.   R. 516 (emphasis in original).  He opined that Plaintiff was incapable of

performing even "low stress jobs," and that she experienced drowsiness as a

medication side effect.  He opined that Plaintiff could sit ten minutes at a time for a total

of less than two hours in an eight hour workday, could stand for five minutes, and could

stand/walk less than two hours during an eight hour workday.  He opined that Plaintiff

would need a job which permitted her to shift positions at will from sitting, standing, or

walking, and that she would sometimes need to take unscheduled breaks.   He opined that she could "rarely" carry ten pounds or less, and had significant limitations in performing repetitive reaching, handling or fingering.  Dr. Scott opined that Plaintiff would likely experience good days and bad days and would miss more than four days per month as a result of her impairments or treatment.  R. 515-19.

In January 2009, Plaintiff presented to Dr. Sninsky with a complaint of heartburn and reported experiencing three bowel movements per day.  Her symptoms included diarrhea, extraintestinal manifestations, and arthralgia.   Dr. Sninsky characterized Plaintiff's Crohn's Disease as "slightly improved" on her current medication regimen.  R. 529-31.

In May 2009, Plaintiff reported experiencing diarrhea with mucus and some bright red blood with cramping.  She reported that she increased her Prednisone and that helped with her diarrhea, but not her pain and urgency.  Dr. Sninsky noted that Plaintiff's Crohn's Disease, which had been diagnosed at age 15, was "hard to control due to drug intolerances."  R. 532-34.

In May 2009, Plaintiff  was admitted to North Florida Regional Medical Center due to an exacerbation of Crohn's disease.  She presented with increased abdominal cramping and bloody diarrhea.  A colonoscopy revealed "severe Crohn's disease characterized by erythematous, eroded, inflamed and multiple deep ulcerations mucosa involving the entire colon but with skip areas." R. 536, 541-42.  At a follow-up with Dr. Sninsky, Plaintiff  reported experiencing three bowel movements per day that were

mixed with blood and mucus.  She reported abdominal pain, diarrhea, nocturnal bowel movements, fecal urgency, hematochezia, weight loss, nausea, extraintestinal manifestations and arthralgia.  Dr. Sninsky noted that Plaintiff's Crohn's Disease was "characterized as slightly worse" and she had "severe Crohn's disease activity."  R. 572-74.

In August 2009, Plaintiff reported experiencing two bowel movements per day and her symptoms included weight gain, extraintestinal manifestations, and arthralgia. Dr. Sninsky characterized Plaintiff's Crohn's Disease as "completely controlled," noted that she was compliant with her medication regimen, and noted her Crohn's Disease currently was in remission.  R. 631-34.

In December 2009, Plaintiff reported experiencing three bowel movements per day and her symptoms included abdominal pain, diarrhea, fecal urgency, fatigue, extraintestinal manifestations, and arthralgia.  Dr. Sninsky noted Plaintiff's Crohn's Disease was "characterized as slightly worse" and the disease was in partial remission. R. 635-38.

In March 2010, Plaintiff reported experiencing alternating days with three bowel movements and then no bowel movements for a few days.  Her symptoms included abdominal pain, diarrhea, fecal urgency, fatigue, extraintestinal manifestations, and arthralgia.  Dr. Sninsky noted that Plaintiff's Crohn's Disease was characterized as "better" and the disease was in partial remission.  R. 639-42.

In August 2010, Plaintiff reported experiencing five loose bowel movements per day; her symptoms included abdominal pain, diarrhea, fecal urgency, fatigue, extraintestinal manifestations and arthralgia.  Dr. Sninsky noted that Plaintiff's Crohn's Disease was characterized as "slightly improved" and the disease was in partial remission.  R. 643-46.

In October 2010, Plaintiff reported experiencing three bowel movements per day. Dr. Sninsky noted her Crohn's Disease was characterized as "completely controlled" and her  disease was in remission.  R. 647-49.

In March 2011, Plaintiff's Crohn's Disease was characterized as "partially controlled." *Id.*  R. 651.  Plaintiff complained of abdominal pain, extraintestinal manifestations, and arthralgia.  Dr. Sninsky noted that on that date it was unclear if her symptoms were due to disease activity "or another etiology for [left lower quadrant] pain but not likely Crohn's because [bowel movement] controlled."  *Id.*

In July 2011, Plaintiff reported exacerbation of symptoms including seven bowel movements per day, abdominal pain, diarrhea, fecal urgency, weight loss, extraintestinal manifestations, and arthralgia.  R. 656-59.  Dr. Sninsky characterized Plaintiff's condition as "much worse" with "moderate Crohn's disease activity," though Plaintiff had been compliant with her treatment.  R. 656.

In October 2011, Plaintiff underwent a consultative examination by Raul B. Zelaya, M.D., an orthopedist.  Dr. Zelaya observed that Crohn's Disease is associated

with inflammation or synovitis affecting the peripheral joints, and that Plaintiff suffered from acute synovitis affecting the right wrist and the right hand associated with some back pain.  He noted that this type of arthritis is aggravated by the extent of Plaintiff's Crohn's Disease.  His diagnosis was enteropathic arthritis affecting mainly the right wrist and right hand associated with Crohn's disease.  On a Medical Source Statement of Ability to do Work-Related Activities (Physical) form, Dr. Zelaya opined that Plaintiff could occasionally lift/carry up to twenty pounds and could frequently lift/carry up to ten pounds.   Plaintiff could sit one hour at a time for a total of six hours during an eight hour workday, stand for one hour at a time for a total of one hour during an eight hour workday, and walk one hour at a time for a total of one hour during an eight hour workday.  He was unable to form an opinion as to when the limitations he assessed first presented.  Dr. Zelaya did not address any limitations arising from Crohn's disease.   R. 690-99.

In October 2011, a colonoscopy revealed "[m]oderate Crohn's disease in the entire colon with skip area at splenic flexure. Crohn's is characterized as erythematous, eroded, friable (with contact bleeding), inflamed, ulcerated and vascular-pattern-decreased mucosa entire examined colon." R. 708, 740.

In January 2012, Dr. Sninsky completed a Crohn's and Colitis Medical Source Statement, noting that he had been treating Plaintiff for eleven years and had an appointment at least every four months.  He assessed Plaintiff's prognosis as "poor".  Her symptoms included chronic diarrhea, bloody diarrhea, abdominal pain and

cramping, vomiting, nausea, peripheral arthritis and fatigue.   He noted that Plaintiff's

impairments had lasted at least twelve months.   With respect to the functional

limitations stemming from Plaintiff's disease, he opined that she could sit for forty-five

minutes at a time for a total of less than two hours during an eight hour workday, could

stand for fifteen minutes at one time, and could stand/walk for a total of less than two

hours during an eight hour workday.  Plaintiff would need a job that permitted her to shift

at will from sitting, standing or walking, and she would need ready access to a restroom

as she would need to take unscheduled 20-minute restroom breaks on a daily basis.

Plaintiff  would have to lie down or rest every day for an hour during a workday.  She

could rarely carry less than ten pounds.  He opined that Plaintiff's symptoms would

likely be severe enough to interfere with her attention and concentration 25% or more of

the time during a typical workday.  He opined that Plaintiff  was incapable of even "low

stress" work as stress would worsen her GI symptoms and she experienced

concentration problems.  Plaintiff would miss more than four days per month as a result

of her impairments or treatment.  Her impairments "as demonstrated by signs, clinical

findings and laboratory or test results were *reasonably consistent* with the symptoms

and functional limitations" described in his evaluation.   R. 742-46.

On February 7, 2012, Dr. Sninsky wrote a letter clarifying that the limitations

listed on his Medical Source Statement had existed since 2006.  He further expressed

that:

> Even when my note[s] have indicated this patient was in partial remission
> or of an improved condition, side effects from the medicine used to treat
> her conditions (crohns [sic] and rheumatoid [a]rthritis) and multiple

sy[mp]toms and complications have and will continue to prevent her from
being able to function well enough to work in any capacity.
R. 747.

On February 14, 2012, Dr. Scott wrote a letter clarifying that the limitations listed

on his Medical Source Statement had existed since 2006.  He further noted:

> Even when notes have indicated this patient was in partial remission or of
> an improved condition, side effects from the medicine used to treat her
> conditions, permanent damage to various joints (as proven on x-rays) and
> multiple symptoms and complications from her diseases and medicine
> have and will continue to prevent her from being able to function well
> enough to work in any capacity.

R. 748.

On February 27, 2012, Dr. Scott wrote a letter clarifying that Plaintiff's arthritis

was not attributable to Lyme disease.  R. 750.

## C.  Summary of Hearing Testimony

At the February 2012 hearing, Plaintiff testified that she went to college to be a

music teacher and had a teaching job out of college, but was unable to continue due to

her Crohn's symptoms.  R. 61.  She took a clerical job with the Department of

Agriculture and then worked in human resources.  *Id*. at 62-63.   Plaintiff testified that

she has always tried to have a normal life and contribute by going to school and trying

to work.  *Id*. at 63.

Plaintiff stopped working in 2006 because of her illness and prior to giving birth to

her daughter, who has mild cerebral palsy.  Plaintiff testified that she was not confident

that she was physically capable of caring for a child, but she tried to have "somewhat of

a normal life" and she had a very supportive family.  Plaintiff's mother comes to her

house every day to help her and drives Plaintiff's daughter to physical therapy appointments.  Plaintiff tries to go to some appointments, but there are times when her Crohn's prevents her.  She tries not to drive due to the medications that she takes. Plaintiff cares for her own personal needs, except that her husband assists her when she is in arthritis flares.  When Plaintiff's Crohn's flares up, she increases her dosage of prednisone in accordance with her doctor's instructions.  Plaintiff does no housekeeping and only light cooking.  Her husband does the grocery shopping.  R.  52-57.

Prior to leaving her job in 2006, Plaintiff was having problems controlling her symptoms with medications.  After she became pregnant, she had a "huge arthritis flare" that caused pain and inflammation, and she was missing things at work.  She had to have cortisone injections in her fingers and knee.  R. 58, 60.  Plaintiff testified that she rarely travels with her family due to her symptoms.  R. 58-59.

Plaintiff testified that even when she is not in a flare she is constantly fatigued, possibly due to medication or being unable to eat like a normal person.  She has constant neck, back, and wrist pain, as well as constant abdominal pain due to Crohn's. *Id.* at 63-64.  She testified that on good days she uses the bathroom between five and 10 times a day for between five and 20 minutes.  She testified that she also has migraines more than five times per month for two or three days at a time.  She takes Imitrex for migraines and she also takes Pristiq for fibromyalgia and to address the anxiety caused by taking Prednisone.  R. 65.  Plaintiff's pain medications include Cyclobenzaprine, Lorazepam, Hydrocodone, and Imitrex.  She also takes Pantoprazone for abdominal cramping.  *Id.* at 68-69.

The medical expert, Dr. Axline, a board certified orthopedist, testified that Plaintiff's medical records did not reflect that the diagnostic criteria for fibromyalgia were met.  He also concluded that Plaintiff's records did not reflect evidence of rheumatoid arthritis based on physical examination or laboratory tests.  He concluded that Plaintiff did not meet the listing for rheumatoid arthritis.  Dr. Axline stated that Plaintiff's Crohn's has been described as "controlled" based on his understanding of the records.  He testified that records from April 2006 reflected that Plaintiff was not at that time on medications for Crohn's.  He testified that the records showed that as of August 2009 Plaintiff's Crohn's was "officially diagnosed as being in remission."  He noted that a year later it was in "partial remission."  Dr. Axline testified that March 2011 treatment notes indicated that Plaintiff's abdominal symptoms were "probably not coming from Crohn's disease."  He testified that the records did not reflect that Plaintiff met the listing for Crohn's.   Plaintiff's wrist arthritis was not severe, with examinations reflecting essentially normal findings.  Dr. Axline testified that March and April 2011 laboratory work reflected a positive test for Lyme Disease, a disease that was endemic in New Jersey where Plaintiff is from.  He testified that Plaintiff's arthritis as a juvenile was likely to be Lyme Disease.  Her right wrist arthropathy also could be trauma that was not rheumatoid.  He did not find that any other impairments, such as degenerative disk disease of the cervical spine or degenerative sacroiliac changes, were severe.  R. 69-77.

Dr. Axline reiterated that Plaintiff's Crohn's disease was considered "to be controlled with the Prednisone."  He conceded that "I'm not a gastroenterologist," but

affirmed that he does "understand the listing and how to interpret the record."  R. 78.

He conceded that "how close she has to be . . . to a bathroom and how long she has to

spend in there, that's not up to me."  *Id.*  He testified that he was "puzzled" Plaintiff had

been diagnosed with rheumatoid arthritis, for which she was prescribed "strong,

dangerous medications," though he had "no problem" if such medications were being

given for Plaintiff's Crohn's.  *Id.*  He opined that Plaintiff's documented slight grip

weakness was not disabling.  He speculated that Plaintiff was being treated for

rheumatoid arthritis because her Florida doctor was unfamiliar with Lyme disease.  *Id.* at

78, 81.

On cross-examination regarding why Plaintiff's rheumatologist was treating her

for rheumatoid arthritis, Dr. Axline said there was no evidence of such because Plaintiff

did not have synovitis or other positive rheumatoid factor.  R. 82.

He conceded that while Plaintiff's records reflected that in October 2009 her

Crohn's was "in remission," he does not doubt the diagnosis of Crohn's disease but it

does not meet a listing.  He testified that in his opinion Plaintiff's Crohn's did not present

restrictions for office work "because every office has a bathroom associated with it."  R.

84.  He again conceded that he is not a gastroenterologist, but that he had worked hard

to understand the file.  He testified that he assumed that in an office job a person would

be able to get up and use the bathroom whenever they needed to.  He testified that the

record "does not show [Plaintiff] ever complained of urgency."  R. 85.  When Plaintiff's

counsel pointed out that Plaintiff's records documented fecal urgency in August 2010

and other dates, Dr. Axline stated "that's the exhibit in which she said her abdominal

symptoms are not caused by Crohn's disease."  R. 86.  Upon further discussion on the

record, Dr. Axline corrected himself, noting that in March 2011 the treatment notes

reflect that "abdominal symptoms are not caused by Crohn's disease since her bowel

movements are controlled."  *Id.* at 86.  Plaintiff's counsel pointed out that the March

2011 note referred to Plaintiff's complaint of left lower quadrant pain, which Dr. Sninsky

suggested could be attributed to some other etiology.  *Id.* at 87.  Dr. Axline conceded

that when a specialist has been treating a patient for a long period of time they might

not repeat diagnostic examinations at each visit but rather would assess whether the

patient is improved or experiencing an exacerbation.  *Id.* at 88-89.

A vocational expert (VE) testified that Plaintiff had past work as a retail sales

clerk, a technical training coordinator, an administrative assistant, and a music teacher.

Because both of Plaintiff's treating physicians assessed her as unable to work, the ALJ

relied on Dr. Zelaya's assessment in formulating a hypothetical.  Based on a person of

Plaintiff's age, experience, and the exertional limitations assessed by Dr. Zelaya, the VE

concluded that the only past work that Plaintiff could perform was that of administrative

assistant.  The VE testified that an administrative assistant would be allowed to take a

bathroom break of five minutes every hour, but the job would not allow for more than

two absences a month.  The VE conceded on cross-examination that a total of 35

minutes of breaks, in addition to regularly-schedule breaks, "could become problematic

over time."  If the breaks were at 10 minutes per hour, "[t]hat could be excessive and

over time they would probably lose their job."  A person in a sedentary but unskilled job

would not be able to take unscheduled breaks as needed.  R. 92-99.

During Plaintiff's counsel's closing remarks, the ALJ observed that she had "trouble with [Dr. Scott's] records, which were difficult to read and reflected the doctor's "minimalist . . . note-taking" and "subjective reporting." *Id.* at 100. The ALJ also expressed concerned that Dr. Sninsky allowed Plaintiff to "self-medicate herself, to determine how much Prednisone she takes." R. 100-02.

## IV. Discussion

### A. Opinion of Treating Physicians Dr. Sninsky and Dr. Scott

Plaintiff contends that the ALJ failed to apply the correct legal standards to the medical opinions of record. In finding that Plaintiff was not disabled, the ALJ accorded Dr. Sninsky's opinion regarding Plaintiff's functional limitations "very little weight as they are largely conclusory and without supportive objective medical evidence to justify the severe functional limitations proposed. The record as a whole supports a greater residual functional capacity." R. 25, 27. The ALJ gave "considerable weight to Dr. Axline's unbiased assessment" which provided "cogent rational and record support for his findings and opinions." R. 27. The ALJ gave "more weight" to Dr. Axline's opinion than the treating physicians because it was "more consistent with the record when considered as a whole." *Id.* The ALJ afforded "significant weight to the unbiased opinion of Dr. Zelaya, the consultative examiner, as this source performed a thorough examination and issued limitations that are well supported by his examination and by the medical record overall." *Id.*

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is

shown to the contrary.[22]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[23]

While there is no requirement for the ALJ to discuss every medical record in the administrative record, he is "required to state with particularity the weight he gave the different medical opinions and the reasons therefor."[24]  Additionally, because an ALJ is not permitted to substitute his judgment for that of the medical experts,[25] the ALJ cannot reject portions of a medical opinion without providing an explanation for such a decision.[26]  Where an ALJ fails to sufficiently explain how he reached his decision, the Court may not speculate.[27]

---

[22] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[23] 20 C.F.R. § 404.1527(d)(2).

[24] Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990)(noting "the ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence").

[25] Graham v. Bowen, 786 F.2d 1113, 1115 (11th Cir. 1986); Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).

[26] Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1337 (M.D. Fla. 2003).

[27] Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984).

The Court concludes that the ALJ in this case provided only conclusory reasons for affording Dr. Sninsky's opinion regarding the functional limitations imposed by Plaintiff's Crohn's Disease "very little weight".   The ALJ wholly failed to address Dr. Sninsky's February 7, 2012, letter in which he made clear that his patient—whom he had treated regularly and continuously for more than a decade and personally examined approximately every four months—suffered from symptoms and medication side effects that precluded work in any capacity.  The ALJ dismissed Dr. Sninsky's earlier functional assessment as "without supportive objective medical evidence," without discussing in any meaningful way the extensive treatment and examination notes, summarized above, that reflect supporting findings.

For example, Dr. Sninsky assessed that Plaintiff's symptoms required that she be able to take bathroom breaks of up to 20 minutes at a time as needed.  His treatment notes reflect that Plaintiff experienced symptoms such as numerous daily bowel movements and fecal urgency accompanied by pain.  Dr. Zelaya—whose consultative opinion the ALJ gave "significant weight"—did not address *any* limitations arising from Crohn's disease, and therefore his assessment provides no basis for rejecting Dr. Sninsky's assessment of Plaintiff's limitations.   *See* R. 690-99.

Dr. Axline conceded that he is not a gastroenterologist and was unable to assess Plaintiff's need to be near a bathroom or the duration of any needed breaks necessitated by her symptoms, and therefore his opinion provides no basis for rejecting this aspect of Dr. Sninsky's functional assessment.  R. 78.  The VE testified that a

person who required multiple 20-minute bathroom breaks in a workday— as assessed by Dr. Sninsky— would probably lose their job.  R. 92-99.

 To determine the weight to be accorded a treating physician's opinion, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1527(d), which include the length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the records as a whole, and specialization of the treating physician.  The record in this case does not reflect that the ALJ adequately considered each of these factors, in particular the length of treatment (which the ALJ mischaracterized as "since at least 2004"), the frequency of examination, the nature and extent of the treatment relationship, and Dr. Sninsky's specialization as a gastroenterologist and expert in the treatment of Crohn's Disease in determining that his opinion was entitled to "very little weight."

 On this record, the Court concludes that the ALJ's decision does not demonstrate "good cause" for rejecting Dr. Sninsky's opinion because the ALJ's decision does not adequately account for the factors that must be considered in determining the proper weight afforded to his opinion.  The ALJ also does not adequately explain why Dr. Sninsky's functional assessment regarding Plaintiff's need for bathroom breaks—which is uncontradicted by either Dr. Axline or Dr. Zelaya— should be rejected.  Remand is necessary so that the ALJ can properly account for the relevant factors and adequately explain the basis for evaluating the treating physician's functional assessment.

The ALJ's rejection of Dr. Scott's opinion suffers from similar defects, in particular a failure to account for all of the factors that determine the weight to be afforded a treating physician's opinion.  As Plaintiff points out, of special concern is the ALJ's statement on the record that Dr. Scott's notes were "difficult to read and reflected the doctor's 'minimalist . . . note-taking' and 'subjective reporting.'"  *Id.* at 100.  The ALJ expressed that she had previously experienced similar issues with Dr. Scott's notes in other cases.  *Id.*  Dr. Scott's assessment of Plaintiff's functional limitations is very clear, however.  Because the record does not reflect that the ALJ adequately considered the relevant factors in determining that Dr. Scott's opinion was entitled to "very little weight," *see* 20 C.F.R. § 404.1527(d), the Court concludes that the ALJ's decision does not demonstrate the requisite "good cause" for rejecting that opinion.

## B.  Plaintiff's Subjective Complaints

The ALJ determined that Plaintiff's testimony regarding the limiting effects of her impairments was not wholly credible.  In making this determination, the ALJ observed that Plaintiff stopped working the same year that she gave birth to a child with special needs and therefore "may have stopped working for reasons other than her own medical condition."  R. 27.  The ALJ also noted that Plaintiff's care had been conservative and routine, she had not lost weight due to her condition, she had not required surgery, and her medication had been effective.  *Id.*

In *Hand v. Heckler*, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following pain standard:

> There must be evidence of an underlying medical condition and (1) there
> must be objective medical evidence to confirm the severity of the alleged
> pain arising from the condition or (2) the objectively determined medical
> condition must be of a severity which can reasonably be expected to give
> rise to the alleged pain.

If the Commissioner rejects a claimant's allegations of pain, he must articulate explicit

and adequate reasons, and these reasons must be based on substantial evidence.

*Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).  A clearly articulated credibility

finding with substantial supporting evidence in the record should not be disturbed by a

reviewing court.  *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *MacGregor v.

Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

As Plaintiff points out, her onset date is March 9, 2006, and her daughter was

born in November 2006.  R. 389.  There is nothing in the record that suggests that

Plaintiff knew when she stopped working that she would have a child with special

needs, nor does her desire to have a family suggest that her subjective complaints are

entitled to any less weight.  Her testimony that she receives substantial family

assistance in caring for her daughter is uncontradicted.

Further, while the ALJ described Plaintiff's treatment as "conservative and

routine" the ALJ points to nothing in the record that suggests Plaintiff could not

experience the symptoms she describes despite the nature of the treatment.  Dr. Axline

described Plaintiff's medication regimen as "strong" and "dangerous," suggesting that

Plaintiff's complaints of limitations stemming from medication side effects (as supported

by her treating physicians) are reasonable.   On this record, the Court cannot find that the ALJ's reasons for discrediting Plaintiff's subjective complaints are supported by substantial evidence.

## V.  <u>RECOMMENDATION</u>

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner so that the Administrative Law Judge may conduct further proceedings consistent with this Report and Recommendation.

**DONE AND ORDERED** this 3rd day of August 2015.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge
United States Magistrate Judge